UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| SUSAN GOLD,<br><br>Plaintiff,<br><br>v.<br><br>JOHN A. REED, and<br>ALDEN CONSTRUCTION SERVICES, LLC.<br><br>Defendants,<br><br>and<br><br>MERRIMACK COUNTY SAVINGS BANK,<br><br>Trustee Process Defendant. | Docket No.: |

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL**

NOW COMES the Plaintiff, Susan Gold, by and through her attorneys, Getman, Schulthess, Steere & Poulin, P.A., and pursuant to Fed. R. Civ. P. 8, and hereby states the following claims for relief against Defendants John Reed and Alden Construction Services, LLC, as follows:

**Parties**

1. The Plaintiff, Susan Gold ("Gold"), is a natural person residing at 705 Owen Road, West Chester, Pennsylvania 19380.

2. The Defendant, John Reed ("Reed"), is a natural person residing at 454 Main Street, New London, New Hampshire 03257.

3. The Defendant, Alden Construction Services, LLC ("ACS"), is a New Hampshire limited liability company with a principal office at 454 Main Street, New London, New Hampshire 03257.

4. Reed is a manager and member of ACS, and at all times relevant hereto, Reed was acting on behalf of ACS in his dealings with the Plaintiff.

5. Trustee Defendant Merrimack County Savings Bank is a New Hampshire banking corporation with a principal office located at 89 North Main Street, Concord, New Hampshire 03301. Merrimack County Savings Bank is named solely in its capacity as a Trustee Defendant.

## Jurisdiction and Venue

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and is between citizens of different States.

7. This Court has personal jurisdiction over the Defendants as Reed is a resident of the State of New Hampshire and ACS is a New Hampshire limited liability company, with a principal office in New Hampshire, and that regularly does business in the State of New Hampshire.

8. This Court has personal jurisdiction over the Trustee Defendant as it has a principal office in New Hampshire and regularly does business in the State of New Hampshire.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2), as all Defendants are residents of this State, and a substantial part of the events and omissions giving rise to this claim occurred within this State.

## Facts

### Gold's Purchase of Her Home and Introduction to John Reed

10. On March 1, 2021, Gold closed on the sale of the existing residence located at 3042 State Route 109, Town of Cambridge, Vermont (postal address 3042 State Route 109, Waterville VT 05492).

11. Gold purchased the home to serve as a vacation home and to be closer to her brother in Vermont and other family in New England.

12. At the time she purchased it, the home (originally built in 1850) was in need of significant repairs in order for Gold to enjoy it in the manner she envisioned.

13. Prior to closing on the home, Gold was introduced through a mutual acquaintance to Defendant John Reed in January 2021. Reed offered his professional services to Gold in undertaking the repairs needed for the home.

**Representations by Reed and the Parties' Dealings Prior to Contract Execution**

14. As detailed herein, Reed made various material misrepresentations to Gold about a proposed construction services agreement, including but not limited to providing an unrealistic budget amount for the work Gold required, the timeframe in which Reed reasonably could complete the work, his ability and qualifications to actually complete the work, the uses for which the money that Gold would pay to Reed would be used, and his ability to efficiently retain qualified local tradespersons and subcontractors necessary to complete the work.

15. Reed assured Gold that he would refurbish the home on time and on budget. He described his working relationship with clients as being "extreme [sic] consultative – my clients are involved in every aspect of their project."

16. Reed held himself out as having the ability to perform the work requested by the Plaintiff in a workmanlike, diligent, and timely fashion, in accordance with all applicable building codes, regulations, and applicable law.

17. Reed promised to build Gold a refurbished home that would "be a place that brings you peace," and spoke of creating a "sanctuary of sorts."

18. Most importantly, knowing that Gold wished to begin construction as soon as possible after the March 1, 2021 closing, Reed indicated that "[t]he timing could be perfect" as he was wrapping up another project on Grand Isle Vermont "near the end of February."

19. Time was of the essence for Gold. She wanted a contractor who would be able to get the job done in time for her to enjoy the house for most of the Vermont summer.

20. Notwithstanding that her property's location in Cambridge, Vermont was more than a two-hour drive away from Reed's base of operations in New London, New Hampshire, Reed held himself out as having sufficient contacts with tradespersons in Vermont to be able to deliver the on-time and on-budget renovations Gold required.

21. Reed assured Gold that the distance would not be a problem, because Reed would stay for the workweek in Vermont while working on the project and return to New Hampshire on the weekends. Reed implied that he and his laborers and subcontractors would work five-day weeks to complete the project on time.

22. Both expressly and through implication, Reed assured Gold that her project would be his sole ongoing project once construction commenced.

23. Reed also knew that keeping to a $100,000 budget was important to Gold, as Gold told him this on numerous occasions. Reed promised Gold that "I'm not here to break the bank, I'm here to help you bring to light your vision."

24. Based upon these and other representations, Gold chose Reed and his company ACS as the general contractor for the project. Reed's promises to complete the project by early summer were a material inducement for her choice of Reed and ACS over another contractor.

25. Indeed, the scope of the refurbishment project expanded once Gold spoke with Reed, as Reed convinced Gold that immediately commencing with a porch renovation (which she had intended to do at some later date) would be more efficient and would provide cost savings.

**The Construction Sales Agreement**

26. Reed presented Gold with a "Construction Sales Agreement" dated April 11, 2021, which Gold signed on April 11th and returned to him. Reed signed the contract on April 27th and provided Gold with a PDF copy of this agreement. A true and correct copy of the contract signed by both parties is attached hereto as **Exhibit A**.

27. In the contract, ACS promised to perform all labor and supply all materials necessary to complete the work described on the attached proposal, and as depicted on attached plans drawn by ACS. In exchange, Gold was to pay ACS payments totaling $104,730 pursuant to a specified "Draw Schedule."

28. The contract acknowledged that time was of the essence and provided that work would commence on May 17, 2021 and would be "substantially completed within five weeks."

29. The referenced proposal, a true and correct copy of which is attached hereto as **Exhibit B**, consisted of a bathroom renovation priced at $35,880.00; bathroom structural work priced at $5,600.00; basement beam work priced at $2,350.00; paint and miscellaneous repairs priced at $12,650.00; construction of a kitchen peninsula priced at $1,400.00; and a porch renovation priced at $48,250.00 (which was added to the project at Reed's encouragement), for a total of cost of $106,000.

30. The contract provided that, "Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement, the CONTRACTOR confirms the Contract Time is a reasonable period for performing the Work." **Ex. A** at 3.

31. The contract contained a mechanism for the extension of the completion date in limited and unusual circumstances outside the contractor's control. Id.

32. No occurrences triggering the foregoing extension provision occurred.

**Post-Signing Conduct and Commencement of the Project**

33. Both in initial discussions with Reed, and from the language of the contract she signed, Gold reasonably understood that the amounts paid to ACS as specified in that contract would be used to purchase materials and to pay workers to complete the work on her home. She did not understand that Reed would use those funds for other projects or for his own personal use.

34. In accordance with the parties' contract, Gold made an initial payment to ACS via wire transfer to ACS's operating account at Merrimack County Savings Bank in the amount of $26,182.50 on May 3, 2021, prior to the commencement of the work. She thereafter made wire transfers in the amount of $26,182.50 on June 7th and June 30, 2021. Notwithstanding the construction start date of May 17, 2021 specified in the contract, Reed did not start work on the project until May 25th.

35. After work commenced, Gold noticed significant differences between what she had been promised and what actually was occurring on the project. Reed did not in fact have sufficient contacts to complete the work on time and on budget in the Cambridge, Vermont area.

36. He initially brought to the job two unskilled general laborers whom he fired after approximately three weeks because they were unable to work independently. He eventually hired a laborer with more skills, but that person could only work two days per week, at most.

37. There later on were significant delays and missed promises in getting appropriate tradespersons such as a plumber to the house to proceed with the work.

38. Reed's implied representation that he would stay in the area during the work week and put in five-day workweeks at the site—upon which Reed's five-week completion schedule was predicated—evaporated. Five-day workweeks rarely, if ever, occurred. There were occasional four-day weeks; most weeks consisted of two or three days on the job, and by autumn, there were weeks when Reed never came to work.

39. Gold learned that notwithstanding Reed's implied promise that her project would be his sole and primary job until it was completed, Reed was performing additional jobs overlapping with hers which were keeping him away from her project.

**Problems Worsen after July 1st Completion Date is Missed**

40. The five-week substantial completion date did not hold. Once work began, the promised completion date of July 1st became August 1st, then Labor Day, and then the beginning of October.

41. The material inducement for Gold of spending the majority of summer 2021 in her renovated home did not happen.

42. From July on, the problems described above became particularly acute, and Reed, who had from the outset been difficult to reach, became increasingly less responsive to Gold's emails and text messages seeking updates and begging him to return to the site.

43. While Gold had considered legal action as early as August, Gold reasonably believed she had no option but to continue to trust that Reed would eventually complete the work on budget because Reed and ACS had tens of thousands of dollars of her money and had delivered little. Finding a new contractor would further delay completion of the progress by weeks or months. Gold was stuck.

**Matters Come to a Head in Autumn 2021**

44. Finally, in September 2021, Gold had had enough and sought to withhold roughly half of the penultimate $18,682.50 payment as an inducement for Reed to actually complete the job.

45. In response, Reed threatened to walk off the job.

46. He told Gold that he was concerned that he would never see the withheld funds or the final payment, despite Gold's prompt payment of the three previous installments specified in the contract.

47. He told Gold that "You can not just pick and choose what invoice amount you want to pay."

48. Desperate, Gold ultimately broke down and wrote ACS a check for the withheld amount, but only after Reed—at Reed's own earlier suggestion—agreed to set and put in writing a final completion date of October 6, 2021 and to reimburse Gold $250.00 per calendar day past October 6th that the contract remained uncompleted.

49. A true and correct copy of this contingency agreement in Reed's own handwriting and signed by Reed as managing member of ACS is attached hereto as **Exhibit C**.

50. Reed did not complete the project and as of this writing, the project remains uncompleted.

**Gold Has Suffered Significant Harm due to the Defendants' Conduct**

51. Gold has been emotionally devastated and has suffered significant financial harm due to the acts and omissions of Reed and ACS.

52. Gold has been forced to hire a replacement contractor to complete the work she hired and paid Reed and ACS to do.

53. In that process, Gold has learned that Reed significantly underbid the project.

54. Compared with the $7,500 that remained to be paid on the project under the contract with ACS, the replacement contractor (Gerard Bernasconi) has advised that the cost to complete the unfinished work is at least $63,000. This figure does *not* include amounts which Gold must pay the replacement contractor to complete incorrectly done work, which are not being sought in the present Complaint. A true and correct copy of the Affidavit of Gerard Bernasconi is attached hereto as **Exhibit D**.

55. Gold has been unable to live in the home she was promised to be ready in early summer, and yet still must pay the monthly mortgage payment of $1,363.02 regardless.

56. In an attempt to allow both sides to move on from their deteriorated relationship, Gold engaged Reed in discussions toward reaching a monetary settlement payment that would bring resolution for both sides and result in *partial* compensation of Gold for payments made to Reed/ACS which had not gone toward completion of her project.

57. Reed seemed amenable but then stated that due to cash flow problems he would have to collect fees from an additional construction job elsewhere in order to raise the money to (partially) pay back Gold.

58. In a December 10, 2021 email, Gold told Reed that this next "job will likely be my last in the business" and that "I just don't have the stamina to continue (physically and emotionally)." A true and correct copy of this email is attached hereto as **Exhibit E**.

59. Upon information and belief, Reed is suffering from health problems of severity unknown to Gold.

60. Alarmingly, in his email, Reed also warned Gold not to bring third parties into their dispute and warned her not to file legal action. He wrote:

> I want nothing more than to put our relationship behind me, however as much as it's about you, it is also about me. I could not pay you the amount at this moment

> even if you brought legal action. If you do that, I will be forced to turn everything over to my attorney and that will only exacerbate the problem. I will work with you directly (and only directly) to get through this. Third parties need not be brought in again.

61. Reed promised to update Gold in writing about his situation in "as the next few days progress," but Gold never heard from Reed again.

**The Defendants' Precarious Financial Position**

62. Gold has significant concerns that Reed and ACS will not have assets sufficient to pay a judgment in Gold's favor should one be forthcoming in this action.

63. Upon information and belief, Reed's residence is titled in the name of Reed's wife and Reed's mother.

64. Upon information and belief, Reed and ACS maintain valuable personal property, vehicles, tools, and other personal and business property within Merrimack County and the State of New Hampshire.

65. ACS's operating account is maintained at Merrimack County Savings Bank branch in Contoocook, New Hampshire. The last four digits of the account number are -4772.

66. Upon information and belief, Reed also maintains personal banking accounts at Merrimack County Savings Bank.

**COUNT I**
**Breach of Contract / Construction Sale Agreement**
**(Gold v. Reed and ACS)**

67. Gold restates and incorporates by reference all preceding allegations as if fully set forth herein.

68. Gold and the Defendants entered into a contract, supported by good and valuable consideration.

69. The Defendants breached that contract through the above-referenced acts and omissions, including but not limited to failing to complete the project, failing to adhere to the budget, and failing to use funds paid by Gold for the agreed-upon purposes.

70. As a direct and proximate result of the Defendants' breaches, Gold has suffered damages including but not limited to the cost of hiring a new contractor to complete the project at a significant increase over Reed's promised budget, loss of use of the home while construction continues, and other monetary losses. Gold has also been forced to expend attorney's fees to seek redress in this matter.

71. Gold is entitled to the benefit of her bargain with the Defendants.

**COUNT II**
**Breach of Contract / Contingency Clause**
**(Gold v. Reed and ACS)**

72. Gold restates and incorporates by reference all preceding allegations as if fully set forth herein.

73. Gold and the Defendants entered into a contract, supported by good and valuable consideration.

74. The home restoration project was not completed as promised by October 6, 2021.

75. Defendants have failed to pay Gold the $250.00 per day from October 7, 2021 through the date of completion of the project.

76. As a direct and proximate result of the Defendants' breach, Gold has suffered damages.

77. Gold is entitled to the benefit of her bargain.

**Count III**
**Fraud**
**(Gold v. Reed and ACS)**

78. Gold restates and incorporates by reference all preceding allegations as if fully set forth herein.

79. The Defendants misrepresented material facts to Gold as aforesaid, including but not limited to misrepresenting their ability to perform the work; their ability to meet the proposed budget, construction start date, and project completion date; and the use for which funds paid by Gold would be put.

80. The Defendants made these statements knowing they were false, or with conscious indifference to their truth or falsity.

81. The Defendants intended for Gold to rely upon these statements.

82. Gold reasonably relied upon these statements, to her detriment.

83. But for the material misrepresentations made by the Defendants, Gold would not have entered into an agreement with Defendants and would not have paid the Defendants $97,230.

84. Gold also delayed bringing legal action contemplated since August 2021 due to the Defendants' continuing misrepresentations. Upon information and belief, the Defendants' financial positions have materially weakened since that time.

85. As a direct and proximate result of the Defendants' breaches, Gold has suffered damages including but not limited to the funds paid to the Defendants, the cost of hiring a new contractor to complete the project at a significant increase over Reed's promised budget, loss of use of the home while construction continues, and other monetary losses.

**COUNT IV**
**Negligent Misrepresentation**
**(Gold v. Reed and ACS)**

86. Gold restates and incorporates by reference all preceding allegations as if fully set forth herein.

87. The Defendants misrepresented material facts to Gold as aforesaid, including but not limited to misrepresenting their ability to perform the work; their ability to meet the proposed budget, construction start date, and project completion date; and the use for which funds paid by Gold would be put.

88. The parties did not have equal knowledge as to the subject matters of these misrepresentations.

89. The Defendants made these misrepresentations without exercising reasonable care to ensure that these statements were true.

90. The Defendants intended for Gold to rely upon these misrepresentations.

91. Gold reasonably relied upon these misrepresentations, to her detriment.

92. But for the material misrepresentations made by the Defendants, Gold would not have entered into an agreement with Defendants and would not have paid the Defendants $97,230.

93. Gold also delayed bringing legal action contemplated since August 2021 due to the Defendants' continuing misrepresentations. Upon information and belief, the Defendants' financial positions have materially weakened since that time.

94. As a direct and proximate result of the Defendants' breaches, Gold has suffered damages including but not limited to the funds paid to the Defendants, the cost of hiring a new contractor to complete the project at a significant increase over Reed's promised budget, loss of use of the home while construction continues, and other monetary losses.

**COUNT V**
**Violation of N.H. Rev. Stat. Ann. 358-A**
**(Gold vs. Reed and ACS)**

95. Gold restates and incorporates by reference all preceding allegations as if fully set forth herein.

96. Through the above acts and omissions, the Defendants engaged in unfair methods of competition and/or unfair and deceptive acts and practices within this State.

97. A substantial majority of these acts and omissions, including misrepresentations made during telephone calls, e-mails, and text messages by the Defendants, were made from within the geographical boundaries of the State of New Hampshire.

98. The $97,230 in funds paid by Gold to the Defendants as a result of the Defendants' material misrepresentations were deposited into a bank account located in the State of New Hampshire.

99. Upon information and belief, those funds were withdrawn by the Defendants from that bank account located within the State of New Hampshire and were then partially used by the Defendants for purposes unrelated to Gold's home.

100. The Defendants' acts and omissions were willful and knowing violations of Chapter 358-A of the N.H. Revised Statutes Annotated, entitling Gold to double or treble damages.

101. As a direct and proximate result of these acts and omissions, Gold suffered damages including but not limited to funds paid to the Defendants, the cost of hiring a new contractor to complete the project at a significant increase over Reed's promised budget, loss of use of the home while construction continues, and other monetary losses. Gold has also been forced to expend attorney's fees to seek redress in this matter.

**COUNT VI**
**Alter Ego / Piercing the Corporate Veil**
**(Gold v. Reed and ACS)**

102. Gold restates and incorporates by reference all preceding allegations as if fully set forth herein.

103. Reed operated ACS as a mere alter ego and failed to adhere to corporate formalities.

104. Upon information and belief, Reed intermingled personal and business funds without proper accounting for the same.

105. Upon information and belief, ACS has been inappropriately capitalized at all times relevant hereto.

106. Upon information and belief, Reed has intentionally withdrawn assets necessary to satisfy ACS's debts and potential judgments, including in anticipation of a legal claim by Gold herself.

107. Reed has used the corporate form to promote an injustice and/or fraud on Gold.

108. Accordingly, the corporate veil should be pierced and Reed should be held personally liable for debts, awards, costs, attorney's fees, and/or judgments awarded against ACS.

**COUNT VII**
**Declaratory Judgment / Rescission**
**(Gold v. Reed and ACS)**

109. Gold restates and incorporates by reference all preceding allegations as if fully set forth herein.

110. "Any person claiming a present legal or equitable right or title may maintain a petition against any person claiming adversely to such right or title to determine the question as between the parties, and the court's judgment or decree thereon shall be conclusive." RSA 492:22, I.

111. Through their conduct as aforesaid, the Defendants induced Gold to enter into the Construction Sales Agreement through fraudulent and/or negligent misrepresentations.

112. But for these misrepresentations, Gold would never have entered into this agreement.

113. Gold asserts and seeks a judicial declaration that the parties' contract is rescinded and of no further effect as Gold's entry into such contract was induced by way of fraudulent and/or negligent materials misrepresentations of fact.

**COUNT VIII**
**Conversion**
**(Gold v. Reed and ACS)**

114. Gold restates and incorporates by reference all preceding allegations as if fully set forth herein.

115. As set forth above, Defendants intentionally and unlawfully exercised exclusive dominion and control over Gold's construction payments so as to deprive Gold of said funds without consent or authorization but instead under false pretenses.

116. As a direct and proximate result of these wrongful acts, Gold has suffered damage including but not limited to the loss of construction funds paid to the Defendants.

**WHEREFORE**, the Plaintiff, Susan Gold, prays that this Honorable Court:

A. Enter judgment in Gold's favor on all counts herein;

B. Award Gold the full amount of monetary damages to which she is entitled at law;

C. Award Gold her costs, interests, and reasonable attorney's fees incurred in connection with this suit;

D. Grant Gold such injunctive relief as necessary to preserve her rights;

E. Enter a judicial declaration that the parties' contract is rescinded and of no further effect;

F. Grant Gold's *Ex Parte* Petition to Attach, filed simultaneously herewith; and

G. Grant such further and additional relief as it deems just.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL MATTERS SO TRIABLE**

Respectfully submitted,

SUSAN GOLD

By her attorneys,

GETMAN, SCHULTHESS, STEERE & POULIN, P.A.

Dated: January 25, 2022

By: /s/ *Stephen D. Coppolo*

Stephen D. Coppolo (NH Bar# 18298)
1838 Elm Street
Manchester, NH 03104
Tel: 603-634-4300 x. 708
scoppolo@gssp-lawyers.com

* * * * * *

**VERIFICATION**

**Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct and is based upon my personal knowledge. Executed on January 25, 2022.**

/s/ Susan Gold
Susan Gold